UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

AUDREY PASS,

        *Plaintiff,*

   -against-

EMPIRE STATE REALTY TRUST, INC.,
and ANTHONY E. MALKIN, Individually,

        *Defendants.*

------------------------------------------------------------------X

**Docket No.:**

**COMPLANT**

**PLAINTIFF DEMANDS
A JURY TRIAL**

Plaintiff Audrey Pass, as and for her Complaint, respectfully alleges, all upon information and belief as follows:

### JURISDICTION AND VENUE

1.    This Court has original jurisdiction over the subject matter of this litigation pursuant to 28 U.S.C §1331, in that certain of the Plaintiff's claim arise under the laws of the United States, namely the Age Discrimination in Employment Act of 1967, 29 U.S.C. §623 (a)-1 et seq. ("the ADEA"), and supplemental jurisdiction exists over the remainder of Plaintiff's claims under Chapter 1, Title 8 of the Administrative Code of the City of New York, §§8-107(1)(a) and (7), pursuant to 28 U.S.C. §1367.

2.    Venue is proper under 42 U.S.C §2000e-5(f)(3) and 28 U.S.C §1391(b) because Defendants reside and do business within the Southern District of New York, where Plaintiff was employed.

3.    Plaintiff filed a charge of unlawful discrimination and retaliation with the Equal Employment Opportunity Commission on February 5, 2019 and received a Notice of Right to Sue against Defendant Empire State Realty Trust, Inc., on July 19, 2019.

## IDENTITY OF THE PARTIES

4.      At all relevant times mentioned herein, Plaintiff Audrey Pass ("Pass") was employed by Defendants in the County, City and State of New York, until her retaliatory termination on October 29, 2018, because of her complaints of age discrimination.

5.      At all relevant times mentioned herein, Defendant Empire State Realty Trust, Inc. ("ESRT") was and is a corporation duly authorized to do business in the County, City and State of New York, where Pass was employed.

6.      ESRT is a leading real estate investment trust with headquarters in the County, City and State of New York, New York, that owns, manages, operates, acquires and repositions office and retail properties in Manhattan and the greater New York metropolitan area, including the Empire State Building.

7.      Defendant Anthony E. Malkin ("Malkin") serves as the Chairman and Chief Executive Officer of ESRT and at all times was the most senior executive of ESRT, as was his father, Peter Malkin, before him.

## BACKGROUND RELEVANT TO ALL CAUSES OF ACTION

8.      Pass began working at ESRT on or about April 29, 2015, as Chief Marketing Officer.

9.      Pass reported directly to Malkin, the Chairman and Chief Executive Officer of ESRT, who was in a position of managerial or supervisory authority over Pass.

10.     Pass' duties included, among other things, marketing, branding, public relations and social media messaging for the Empire State Building Observatory and Empire State Building's brand, to raise visibility for the Observatory and real estate within the properties owned by ESRT, including the Empire State Building.

11.     At all relevant time, Pass was fully qualified for her position, as confirmed by her extensive experience, the fact that ESRT recruited her, the increased responsibilities Pass received during her employment, and the positive feedback that Pass initially received from Malkin, which included Malkin referring to Pass on multiple occasions as a "good hire."

12.     In 2017, Pass was placed in charge of pitches to two significant brands, Nike and Under Armour.

13.     However, Pass' work environment began to deteriorate in early Fall 2017, when Malkin developed a perception that Pass would not be able to do her job because of her age, regardless of Pass' actual performance.

14.     Following a pitch to AirBNB, one of Malkin's consultants, Mike Berlin, said that the pitch was not successful because Pass "was not a millennial."

15.     Malkin adopted this discriminatory perception and removed Pass from future efforts to obtain that account, judging Pass not on her performance, but on her age.

16.     Soon thereafter, Malkin and Pass attended a meeting with Nike on or about October 19, 2017, which despite their efforts, did not lead to a business relationship.

17.     Malkin, however, did not view the result of the meeting as based on legitimate business circumstances, but instead blamed his and Pass' ages and race for the result, telling Pass that they were "too old and too white" and that Pass, in particular, was not physically "fit" enough to represent ESRT.

18.     Malkin sent an email to Pass and others on October 19, 2017, where he stated, "I do think that we showed up as 'white and old'" for Nike and stated that ESRT should have brought two younger employees of color to the meeting instead, confirming his discriminatory belief that age and race played a role in Nike's decision, as opposed to legitimate business reasons.

19. Malkin, based on his words and actions, clearly wanted to create the appearance of being younger to attract clients and felt that age, rather than experience or ability, was the most important qualification.

20. Malkin could not alter his own age or race and would not remove himself from his own company, nor would he impact the men that were his age with whom he had worked for many years, so Malkin sought to strip Pass of her responsibilities and replace her with someone younger, not because of her abilities or performance, but because he thought Pass was too old.

21. Pass was 52 years old at that time.

22. On November 3, 2017, just weeks after Malkin's email where he referred to himself and Pass as "white and old," Malkin removed Pass from the pitches to Nike and Under Armour and handed that responsibility to two younger individuals of color.

23. Those two individuals were unsuccessful in their pitch to Under Armour and also were unable to arrive at a deal with Nike, and Malkin made excuses that it was because Under Armour was "in flux," though Malkin had blamed Pass' age when he and Pass had the same result.

24. Meanwhile, Pass' performance remained strong, as she successfully closed a lucrative deal with Turkish Airlines and closed another deal with Booking.com that was more favorable than AirBNB.

25. Nevertheless, Malkin continued to express his discriminatory focus on youth, degradingly referring to Pass as a "fossil" in front of her team and business associates and telling Pass that she should hire "more athletes and Ivy League graduates," citing one younger employee (who would subsequently be fired) as an example, which was part of Malkin's focus on youth.

26. Malkin also began to marginalize Pass, which included canceling his one-on-one meetings with her.

4

27.     At the end of 2017, Malkin suddenly told Pass that she was not meeting the expectations of her job description, yet when Pass showed Malkin the job description – which he had created prior to Pass' hiring – Malkin said that the job description was "terrible" and not right and needed to be changed, confirming that Malkin was simply looking for criticisms against Pass.

28.     On or about April 3, 2018, Malkin hired a younger woman named Abigail Rickards ("Rickards"), who was in her late 20s, to serve as Vice President/Director of Marketing.

29.     Malkin acknowledged to Pass that he had "run right over" her in hiring Rickards, and referred to Pass as a "Den Mother," which was a degrading reference to Pass' age.

30.     Malkin clearly favored the much younger Rickards, which included ignoring the concerns of several employees that Rickards lacked sufficient experience, refusing to even consider other candidates and elevating Rickards' title to "Vice President," even though the role was actually a "Director" level position.

31.     Malkin, thereafter, sought to push Pass out of ESRT and concocted a claim of poor performance to do so.

32.     Much of Malkin's criticisms against Pass centered on his desire to focus on digital marketing, yet it was Pass who had been advocating for a focus on digital marketing since she her interview, and Pass was also completing a certificate from Hunter College in digital marketing with a 4.0 grade point average.

33.     Furthermore, Pass had proven her competence with digital marketing by creating ESRT's social media presence, which led to ESRT winning the Edward R. Murrow Award for Excellence in Social Media in 2016, due to a digital campaign Pass led regarding the 2016 Presidential Election, as well as Buzzfeed naming one of the desserts at the Empire State Building's restaurant "One of America's Most Instagrammable" in 2018, which Pass led by

working with the Chef to create a signature dessert that would match the nightly color of the lights on the building.

34.    Despite Pass' accomplishments, Malkin simply discounted Pass because of her age, stating, "You'll never understand social media."

35.    Malkin subjected Pass to a humiliating hostile work environment where she was diminished, not because of her abilities or experience, but because of Malkin's discriminatory perception that Pass was too "old" to contribute, which included, only by way of example, at least the following:

- Telling Rickards in front of Pass that Pass was "too old and too slow;"

- Assuming that Rickards' youth somehow provided her special knowledge, despite her lack of experience, saying to Rickards in front of Pass, "I am not questioning you.  I want to learn from you. You came in fast and we are moving like molasses;"

- Telling Pass, "You simply cannot understand the digital/social' marketing," which was completely untrue, yet Malkin refused to acknowledge Pass' achievements because of her age;

- Continuing to refer to older employees like Pass as "fossils;"

- Taunting Pass as "Analogue Audrey" to degrade her ability to handle digital platforms and stripping Pass of social media responsibilities, despite her established experience in digital marketing, and instead assigning digital work to the significantly younger Rickards;

- Attacking Pass' physical appearance, which was tied to his discriminatory belief that only young and fit individuals should be client-facing, by degradingly telling Pass to "get help" and saying, "Your emotional health is negatively affecting your physical health, and your physical health is not well," which was based on Malkin's discriminatory desire for younger individuals;

- Assigning Rickards work that would normally have been assigned to Pass;

- Telling Pass that she looked "too much like a school principal," which was a clear and degrading reference to Pass' age;

- Criticizing Pass for not being "fit" or "athletic" and telling her to use the fitness center and seek help for her physical and emotional health, which was directly related to Pass' age and Malkin's focus on youth;

- Holding one-on-one meetings with Rickards, even though Pass was supposedly Rickards' direct supervisor.

The above are merely examples of the humiliating and degrading hostile environment that Pass endured because of her age, which were so severe and/or pervasive as to create a hostile work environment for Pass.

36.     On or about June 5, 2018, Pass met with Kelly Davis ("Davis"), the Senior Vice President of Human Resources for ESRT, and complained about age discrimination.

37.     Davis acknowledged the validity of Pass' complaint, but warned that if Pass lodged a "formal" complaint, Davis would have to investigate and "there will be repercussions," even though Davis said there should not be, which Pass knew referenced that Malkin was the most senior person at the company.

38.     Pass asked Davis what to do, and Davis said, "This is confidential, but I'll give you the names of several lawyers," and Davis did give Pass the names of several attorneys.

39.     Approximately two weeks later, ESRT announced that Davis would be leaving ESRT.

40.     On July 13, 2018, Pass sent a letter to Jacqueline Burns ("Burns"), the Vice President of Human Resources and ESRT's most senior individual in human resources, again complaining about age discrimination and advising Burns that Pass had retained an attorney.

41.     Additionally, Pass' attorney sent a letter to ESRT on July 16, 2018, and was thereafter in communication with ESRT's counsel.

42.     ESRT then conducted an investigation into Pass' complaint and Pass cooperated with the investigation and met with an outside investigator, Catherine Walters, Esq. ("Walters") on July 24, 2018.

43.     On August 16, 2018, Pass was called into a meeting with Malkin and Burns, and was provided with a letter from Thomas N. Keltner, Jr. ("Keltner"), Executive Vice President and General Counsel of ESRT, that purported to contain the "results" of Walters' investigation.

44.     While Keltner, who ultimately reports to Malkin, stated that the investigation substantiated much of Pass' complaint, including the fact that Malkin referred to Pass as "too old and too white," a "fossil" and "Analogue Audrey," Keltner made disingenuous excuses for such conduct, including that Malkin "used these words differently" and that certain comments were made "in the context of coaching," even though Malkin's clear and degrading reference to Pass' age was self-evident from his comments.

45.     That very same day, August 16, 2018, Pass was placed on a performance improvement plan ("PIP"), which was not legitimate, but was clearly done to punish Pass for her complaints and to intimidate her into silence.

46.     The PIP claimed to rely on a "360 degree survey" that was conducted regarding Pass, though ESRT never showed Pass the actual survey and only permitted her to see a "Survey Overview" that it created.

47.     The PIP unfairly criticized Pass for not defining the goals and roles of those who reported to her, but ignored that Pass had submitted numerous job descriptions and organizational charts to Human Resources and Malkin and that it was they who did not respond and repeatedly

changed roles back and forth, which consequently left staff members feeling confused and dissatisfied.

48.     In fact, Pass' own job description was still not approved, so that it was disingenuous for ESRT to blame Pass for an issue that she had not created.

49.     The PIP also attacked Pass' "understanding of the needs and capabilities of the department," but omitted that Malkin, and not Pass, had decided to move individuals out of their areas of expertise and into roles where they lacked experience, to which Pass objected, yet Pass was held accountable for decisions that Malkin had made.

50.     Pass protested the retaliatory PIP by a letter dated August 20, 2018.

51.     Despite the palpable hostility in her workplace, Pass continued to perform her duties to the best of her ability and with continued success.

52.     On September 17, 2018, Pass met with Malkin and Jackie Burns ("Burns") of ESRT's Human Resources Department, at which time Malkin acknowledged Pass' positive performance, yet extended the PIP for another 30 days.

53.     Further, Malkin requested that Pass provide ESRT with a list of the industry leaders, stakeholders and experts she had met with through her own efforts and networking and provide a summary of those interactions, which Malkin only did because he wanted to gain the benefit of Pass' work before he ended her employment, yet Pass provided this information to ESRT, nevertheless.

54.     Pass' workplace remained permeated with hostility and retaliation that was causally connected to her repeated complaints, which included Malkin:

- Excluding Pass from important departmental decisions while key responsibilities were delegated elsewhere;

- Continuing to assign Rickards work that should have been assigned to Pass;

- Indicating that he did not expect Pass' employment to continue by acknowledging that he had assigned the "weakest" team member to report directly to Pass because, as Malkin stated, "If you were going to be leaving, I did not want to pollute the whole group," as if Pass' presence could "pollute" the team;

- Instituting regular one-on-one meetings with Pass' two most senior reports, yet not having such meetings with Pass or sharing with her what occurred during his meetings with her reports;

- Authorizing Rickards to hold a team building barbeque at her home on Yom Kippur, even though he knew that Pass would not be able to attend on that Jewish holiday, so that Pass was the only individual not able to attend, and even offering to reimburse Rickards for the barbeque;

- Excluding Pass from participating in Rickards' 90-day review, even though Pass was supposedly supervising Rickards.

The above are merely examples of the retaliation that Pass endured, which would be reasonably likely to deter anyone from engaging in protected activity.

55. Pass' diminishment became so apparent that one colleague said to her that Pass was being treated so poorly that she "would have left long ago" if she were Pass, and another told Pass that she could not help her solve her work challenges because Pass was not "valued" by her superiors and had no "influence or voice" with management.

56. Nevertheless, Pass continued to succeed at ESRT, as Pass' significant efforts led to the Empire State Building being featured on the "Jimmy Kimmel Live" television show on October 15, 2018, sponsored by Google, with Eminem performing in the lobby and Observatory of the Empire State Building, which was a huge success for the ESRT's brand that Pass had negotiated and played a significant role in bringing to fruition.

10

57.     In fact, Pass' efforts were so successful Malkin awarded her an "Empire Accolade" on October 8, 2018 for her work on the television event, confirming Pass' continued contribution to the company.

58.     Pass met with Malkin and Burns on October 22, 2018, at which time Pass was told that the PIP would be extended yet again, for the third month in a row, ignoring Pass' recognized accomplishments during that time.

59.     Pass having the PIP be extended yet again, despite her positive performance during the prior weeks, was demoralizing and made Pass reasonably fearful that the PIP would remain in perpetuity, until Pass either quit or ESRT found a reason to fire her.

60.     On the evening of Thursday, October 25, 2018, Pass sent an email to Malkin complaining about the PIP being extended yet again and stated that it was done to punish Pass for complaining about age discrimination.

61.     Pass was terminated just days later, on the morning of Monday, October 29, 2018.

62.     The reason that ESRT offered for Pass' termination was "poor performance," even though Pass had been told just one week earlier that the PIP would continue for 30 more days and there had been nothing that had occurred in that short period of time since, other than Pass' email of October 25, 2018, confirming that the real reason for Pass' termination was to punish Pass for continuing to assert her rights.

### AS AND FOR A FIRST CAUSE OF ACTION ON BEHALF PASS AGAINST ESRT FOR AGE DISCRIMINATION IN VIOLATION OF THE ADEA

63.     Pass repeats, re-alleges and incorporates in full paragraphs 1 through 62 of this Complaint, as though fully set forth at length herein.

64.     At all relevant times, Pass was in a protected category under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §623(a)(1) ("the ADEA"), because of her age, which was 53 years of age at the time she was terminated on October 29, 2018.

65.     Throughout the time of her employment with ESRT, Pass was fully qualified for her position and was in a position to continue working in that capacity as for the remainder of her career.

66.     ESRT subjected Pass to a hostile environment that was so severe or pervasive as to alter the terms and conditions of her employment, and also took adverse employment action against Pass that culminated in her termination.

67.     The circumstances surrounding Defendants' conduct towards Pass, including, among other things, the fact that she was repeated degraded by being called "too old," a "fossil," "like molasses" and "Analogue Audrey," and many of her responsibilities were given to the substantially younger Rickards, give rise to a very real inference that the actual basis for ESRT's actions against Pass were motivated by age discrimination.

68.     The aforementioned acts of ESRT constitute unlawful discrimination on the basis of age against Pass in violation of the ADEA, 29 U.S.C. §623(a)(1), which provides, inter alia, that:

> It shall be unlawful for an employer (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age . . .

69.     As a direct and proximate result of ESRT's conduct complained of herein, Pass has suffered damages, injuries and losses, both actual and prospective, which include financial loss,

damage to her career and emotional pain and suffering, so that Pass seeks in this First Cause of Action compensatory damages in an amount to be determined at a trial of this matter, as well as reasonable attorney's fees, the costs of this action and pre-judgment interest.

70.     Here, the acts of ESRT were done so clearly with reckless indifference in the face of a perceived risk that its actions would violate Pass' protected rights under the ADEA that, in addition to all the damages inflicted upon Pass and in addition to all the measures of relief to which Pass may properly be entitled herein, ESRT should also be required to pay punitive damages in an award to be determined at a trial of this matter as punishment for its discriminatory conduct, in order to deter ESRT and others similarly situated from engaging in such conduct in the future.

### AS FOR A SECOND CAUSE OF ACTION ON BEHALF OF PASS AGAINST BOTH DEFENDANTS FOR AGE DISCRIMINATION IN VIOLATION OF CHAPTER 1, TITLE 8, §8-107(1)(a) OF THE ADMINISTRATIVE CODE OF THE CITY OF NEW YORK

71.     Pass repeats, re-alleges and incorporates in full paragraphs 1 through 62 of this Complaint as though fully set forth at length herein.

72.     At the time Pass was subjected to the discriminatory conduct described herein, she was in a protected class under the New York City Human Rights Law because of her age.

73.     Throughout the time of her employment with ESRT, Pass was fully qualified for her position and was in a position to continue working in that capacity as for the remainder of her career.

74.     Defendants treated Pass less well because of her age and took adverse employment action against her, including both the hostile environment she endured and her termination, all of which was permitted and condoned by Defendants.

75.     The circumstances surrounding Defendants' conduct towards Pass, including, among other things, the fact that she was repeated degraded by being called "too old," a "fossil,"

"like molasses" and "Analogue Audrey," and many of her responsibilities were given to the substantially younger Rickards, give rise to a very real inference that the actual basis for the Defendants' actions against Pass were motivated by age discrimination.

76.     Both ESRT and Malkin, individually, are liable to Pass as "an employer or an employee or an agent thereof" pursuant to §8-107(1)(a) of the New York City Human Rights Law.

77.     The aforementioned acts of Defendants constitute unlawful discrimination against Pass in violation of Chapter I, Title 8 of the Administrative Code of the City of New York, §8-107(1)(a) (referred to herein as "The New York City Human Rights Law"), which provides, *inter alia* that:

> It shall be unlawful discriminatory practice . . .[f]or an employer or an employee or agent thereof, because of the actual or perceived age . . . of any person . . . to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

78.     As a result of Defendants' violations of the New York City Human Rights Law §8-107(1)(a), Defendants are liable to Pass pursuant §8-502(a) of said statute for "damages, including punitive damages," and pursuant to §8-502(f) of the statute for "costs and reasonable attorney's fees," as provided for under the law.

79.     As a direct and proximate result of Defendants' conduct complained of herein, Pass has suffered damages, injuries and losses, both actual and prospective, which include financial loss, damage to her career and emotional pain and suffering, so that Pass seeks in this Second Cause of Action compensatory damages in the amount of Two Million Dollars ($2,000,000).

80.     Here, Defendants' conduct towards Pass shows that they acted with willful or wanton negligence, or recklessness, or a conscious disregard of Pass' rights under the New York City Human Rights Law, or that their unlawful actions against Pass were so reckless as to amount

to a disregard of Pass' rights, so that in addition to all the damages inflicted upon Pass and in addition to all the measures of relief to which Pass may properly be entitled herein, Defendants should additionally be required to pay punitive damages as punishment for its discriminatory conduct in the further amount of Three Million ($3,000,000) Dollars, in order to deter Defendants and others similarly situated from engaging in such conduct in the future.

81.     Pass, therefore, seeks judgment against Defendants on this Second Cause of Action, for, among other things, for compensatory damages in the sum of Two Million Dollars ($2,000,000), and the additional further sum of Three Million Dollars ($3,000,000) in punitive damages, together with costs, pre-judgment interest and reasonable attorney's fees on this cause of action, making a total claim of Five Million Dollars ($5,000,000).

### AS FOR A THIRD CAUSE OF ACTION ON BEHALF OF PASS AGAINST ESRT FOR RETALIATION IN VIOLATION OF THE ADEA

82.     Pass repeats, re-alleges and incorporates in full paragraphs 1 through 62 of this Complaint as though fully set forth at length herein.

83.     Each time that Tafuri opposed SCI's discriminatory conduct, he was engaged in a protected activity under the law, of which SCI was aware.

84.     Each time that Pass complained of the discriminatory conduct to which she was subjected, she was engaged in a protected activity under the ADEA, of which ESRT was aware.

85.     As a proximate result of Pass engaging in protected activity under the ADEA, Pass suffered adverse employment action that was causally connected to her complaints of age discrimination, culminating in her termination on October 29, 2018, just days after one of Pass' complaints.

86.     ESRT's unlawful conduct has adversely affected Pass' employment, her emotional well-being, the quality of her and her life's normal pursuits and Pass believes that the injuries inflicted upon her, which were a direct result of the occurrences complained of herein, have and will continue to cause Pass damage.

87.     The aforementioned acts of SCI constitute unlawful retaliation against Tafuri in violation of the ADEA, 29 U.S.C. §623(d), which provides, *inter alia*, that:

> It shall be unlawful for an employer . . . to discriminate against any of its employees . . . because such individual . . . has opposed any practice made unlawful by this section . . .

88.     As a direct and proximate result of ESRT's conduct complained of herein, Pass has suffered damages, injuries and losses, both actual and prospective, which include financial loss, damage to her career and emotional pain and suffering, so that Pass seeks in this Third Cause of Action compensatory damages in an amount to be determined at a trial of this matter, as well as reasonable attorney's fees, the costs of this action and pre-judgment interest.

89.     Here, the acts of ESRT were done so clearly with reckless indifference in the face of a perceived risk that its actions would violate Pass' protected rights under the ADEA that, in addition to all the damages inflicted upon Pass and in addition to all the measures of relief to which Pass may properly be entitled herein, ESRT should also be required to pay punitive damages in an award to be determined at a trial of this matter as punishment for its discriminatory conduct, in order to deter ESRT and others similarly situated from engaging in such conduct in the future.

**AS FOR A FOURTH CAUSE OF ACTION ON BEHALF OF PASS AGAINST BOTH DEFENDANTS FOR RETALIATION IN VIOLATION OF CHAPTER 1, TITLE 8, §8-107(7) OF THE <u>ADMINISTRATIVE CODE OF THE CITY OF NEW YORK</u>**

90.     Pass repeats, realleges and incorporates in full paragraphs 1 through 62 this Complaint, as though fully set forth at length herein.

91.     Each time that Pass complained of the discriminatory conduct to which she was subjected, she was engaged in a protected activity under the New York City Human Rights Law, of which Defendants were aware.

92.     As a proximate result of Pass engaging in protected activity under the New York City Human Rights Law, Pass suffered adverse employment action that was causally connected to her complaints of age discrimination, culminating in her termination on October 29, 2018, just days after one of Pass' complaints.

93.     Both ESRT and Malkin, individually, are liable to Pass as "any person" pursuant to §8-107(7) of the New York City Human Rights Law.

94.     Defendants' unlawful conduct has adversely affected Pass' employment, her emotional well-being, the quality of her and her life's normal pursuits and Pass believes that the injuries inflicted upon her, which were a direct result of the occurrences complained of herein, have and will continue to cause Pass damage.

95.     The aforementioned acts of Defendants constitute unlawful retaliation against Pass in violation of Chapter I, Title 8 of the Administrative Code of the City of New York, §8-107(7) of the New York City Human Rights Law, which provides, inter alia, that:

> It shall be unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter . . .

96.     As a direct and proximate result of Defendants' violation of the New York City Human Rights Law, Defendants are liable to Pass pursuant to §8-502 of said statute for "damages" and pursuant to §8-502(f) of said statute "for costs and reasonable attorney's fees," as provided for under the law.

97.     As a direct and proximate result of ESRT's conduct complained of herein, Pass has suffered damages, injuries and losses, both actual and prospective, which include financial loss, damage to her career and emotional pain and suffering, so that Pass seeks in this Fourth Cause of Action compensatory damages in the amount of Two Million Dollars ($2,000,000).

98.     Here, Defendants' conduct towards Pass shows that they acted with willful or wanton negligence, or recklessness, or a conscious disregard of Pass' rights under the New York City Human Rights Law, or that their unlawful actions against Pass were so reckless as to amount to a disregard of Pass' rights, so that in addition to all the damages inflicted upon Pass and in addition to all the measures of relief to which Pass may properly be entitled herein, Defendants should additionally be required to pay punitive damages as punishment for their discriminatory conduct in the further amount of Three Million ($3,000,000) Dollars, in order to deter Defendants and others similarly situated from engaging in such conduct in the future.

99.     Pass, therefore, seeks judgment against Defendants on this Fourth Cause of Action, including, among other things, for compensatory damages in the sum of Two Million Dollars ($2,000,000), and the additional further sum of Three Million Dollars ($3,000,000) in punitive damages, together with costs, pre-judgment interest and reasonable attorney's fees on this cause of action, making a total claim of Five Million Dollars ($5,000,000).

### AS AND FOR A FIFTH CAUSE OF ACTION, IN THE ALTERNATIVE, AGAINST MALKIN INDIVIDUALLY FOR AIDING AND ABETTING DISCRIMINATION & RETALIATION IN VIOLATION OF CHAPTER I, TITLE 8, §8-107(6) OF THE ADMINISTRATIVE CODE OF THE CITY OF NEW YORK

100.     Pass repeats, re-alleges and incorporates in full paragraphs 1 through 62 of this Complaint, as though fully set forth at length herein.

101.    Should Malkin be determined to not have individual liability under Administrative Code §8-107(a)(1) or §8-107(7) for any reason, then Malkin should be held personally liable for aiding, abetting and compelling the discrimination and retaliation against Pass, as more specifically detailed in prior paragraphs of this Complaint, all of which are deemed a part hereof.

102.    As more specifically detailed in prior paragraphs of this Complaint, all of which are deemed a part hereof, Malkin aided, abetted and compelled the discrimination and retaliation against Pass, so that, should Pass be deemed to have not been Pass' employer, Malkin should be held personally liable for unlawful aiding and abetting against Elliott in violation of §8-107(6) of the New York City Human Rights Law, which states, *inter alia*:

> It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so.

103.    Malkin aided and abetted ESRT to engage in the conduct complained of and, as a direct result, Pass has and will continue to suffer, among other things, a significant loss of income and benefits, emotional injuries, as well as other losses associated with the effects of ESRT's conduct upon Pass' employment, career and life's normal pursuits.

104.    As a direct and proximate result of Malkin's violation of the New York City Human Rights Law, Malkin is individually liable to Pass pursuant to §8-502(a) of said statute for damages and pursuant to §8-502(f) of said statute for "costs and reasonable attorney's fees," as has been judicially established.

105.    As a direct and proximate result of Malkin's conduct complained of herein, Pass has suffered damages, injuries and losses, both actual and prospective, which include financial loss, damage to her career and emotional pain and suffering, so that Pass seeks in this Fifth Cause of Action compensatory damages in the amount of Two Million Dollars ($2,000,000).

106.    Here, Malkin's conduct towards Pass shows that he acted with willful or wanton negligence, or recklessness, or a conscious disregard of Pass' rights under the New York City Human Rights Law, or that its unlawful actions against Pass was so reckless as to amount to a disregard of Pass' rights, so that in addition to all the damages inflicted upon Pass and in addition to all the measure of relief to which Pass may properly be entitled herein, Malkin should additionally be required to pay punitive damages as punishment for his discriminatory and retaliatory conduct in the further amount of Three Million ($3,000,000) Dollars, in order to deter Malkin and others similarly situated from engaging in such conduct in the future.

107.    Pass, therefore, seeks compensatory damages in this Fifth Cause of Action, including, among other things, the emotional harm inflicted upon him in the sum of Two Million ($2,000,000) Dollars, and an additional and further sum of Three Million ($3,000,000) Dollars for punitive damages, making a total of Five Million ($5,000,000) Dollars in this third cause of action, plus prejudgment interest, the costs of this action, as well as reasonable attorney's fees.

**WHEREFORE**, Pass demands judgment on the First Cause of Action against ESRT in an amount to be determined by the fact finder; on the Second Cause of action against both Defendants in the sum of Two Million Dollars ($2,000,000) in compensatory damages and the further and additional sum of Three Million Dollars ($3,000,000) in punitive damages, for a total of Five Million Dollars ($5,000,000); on the Third Cause of Action against ESRT in an amount to be determined by the fact finder; on the Fourth Cause of action against both Defendants in the sum of Two Million Dollars ($2,000,000) in compensatory damages and the further and additional sum of Three Million Dollars ($3,000,000) in punitive damages, for a total of Five Million Dollars ($5,000,000); on the Fifth Cause of Action, pled in the alternative, against Malkin in the sum of Two Million Dollars ($2,000,000) in compensatory damages and the further and additional sum

20

of  Three Million Dollars ($3,000,000) in punitive damages for a total of Five Million Dollars ($5,000,000); plus, for all causes of action, costs, pre-judgment interest and attorney's fees, and for such other relief as this Court deems just and proper.

**SCHWARTZ PERRY & HELLER, LLP**
*Attorneys for Plaintiff*

By:_____
BRIAN HELLER
DAVIDA S. PERRY
3 Park Avenue, Suite 2700
New York, NY 10016
(212) 889-6565